IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| MICHAEL SHANE DEBAERE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | 1:15CV1023 |
| | ) | 1:13CR329-1 |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Petitioner Michael Shane DeBaere, filed a Motion [Doc. #32] to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255. Petitioner pled guilty in this Court to one count of accessing images of child pornography via a computer with the intent to view in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2). In a Judgment [Doc. #18] entered on April 8, 2014, Petitioner was sentenced to 70 months of imprisonment and fifteen years of supervised release. Following an unsuccessful direct appeal, Petitioner filed the current Motion under § 2255.

Petitioner's Claims

Petitioner raises three claims in his current Motion, all of which allege ineffective assistance of counsel. Petitioner's first claim asserts that counsel provided ineffective assistance by failing to file a motion to suppress evidence gathered during a search at Petitioner's home. Petitioner contends that this search violated the Fourth Amendment of

the United States Constitution. Petitioner's second claim similarly asserts that counsel failed to file a motion to suppress statements made by Petitioner during or related to that search. Petitioner argues that authorities procured these statements through a violation of his rights as secured by the Fifth Amendment of the United States Constitution. Finally, Petitioner claims that counsel incorrectly advised him that he could not withdraw his guilty plea prior to sentencing.

Facts

The facts of the case, as claimed by Petitioner in his Motion [Doc. #32], the attached Exhibit [Doc. #32-1], his Affidavit [Doc. #34], and his Reply [Doc. #45], are as follows.[1] During an investigation of peer-to-peer file sharing networks, authorities identified an Internet Protocol address belonging to Meghan DeBaere, Petitioner's wife, as having been associated with inappropriate materials. (Motion at ¶5.) On April 4, 2013, Detective David Sykes of the Alamance County Sheriff's Department, Special Agent Charles Cook of the United States Department of Homeland Security, and another agent from that Department visited the home shared by Ms. DeBaere, Petitioner, and their children. (Motion at ¶5, 8.) Petitioner was not home, but Ms. DeBaere invited the officers into the home and spoke with them. (Motion at ¶6, Exhibit at 8.) When informed that her internet address had been associated with inappropriate materials, Ms. DeBaere told the authorities that the couple's seven-year-old son had accessed pornography on a computer without their knowledge. (Motion at ¶6.) She then

---

[1] The Court notes that the Reply was signed and filed by retained counsel, Mr. David Freedman, but is written in the first person and appears to include Petitioner's *pro se* assertions. See, e.g., Reply at 2 ("I repeat unequivocally that the facts as set forth in my Verified Petitioner and my wife's Affidavit are true and accurate. If [trial counsel's] memory under oath is otherwise, then I affirmatively state that his memory is incorrect."). It is not clear why these assertions in the Reply were signed and filed by Mr. Freedman, and given the context, the Court will consider the assertions as Petitioner's own assertions in this case.

2

allowed Detective Sykes to scan two computers in order to clear any remaining inappropriate downloads. (Motion at ¶7.) As the second computer was being scanned, Sykes asked Ms DeBaere about the dates on which her son accessed pornography. (Id.) She provided the dates and he told her that those dates did not match with the dates of the activity that triggered the visit. (Id.) He then asked her if she would call her husband to come home, which she did. (Motion at ¶8.)

Petitioner returned home at about the same time Detective Sykes pronounced the two computers that he checked to be "clean." (Motion at ¶8.) He and Agent Cook then introduced themselves to Petitioner, and Petitioner learned that they had been talking to Ms. DeBaere about "strange activity" on the home's network. (Motion at ¶8,9.) The officers asked Petitioner if he would mind answering questions, and he agreed. (Motion at ¶9, Affidavit at 4.) Petitioner denied ever searching for child pornography or downloading an inappropriate file by accident. (Motion at ¶9, 10.) Petitioner's wife interjected that she had already told the officers about the incident with their son and they replied that they had ruled that incident out as the source of the inappropriate searches. (Motion at ¶10.) Officers then asked Petitioner to go to a bedroom, where they talked with the door open. (Motion at ¶10, Affidavit at 5.) Petitioner was questioned about, and again denied making, any inappropriate searches or downloads related to child pornography. (Motion at ¶11.) Agents then asked if there were any other computers in the home besides the two that had been scanned with Ms. DeBaere's consent. (Motion at ¶12.) Petitioner then retrieved two non-functioning laptop computers from upstairs and placed them on the kitchen table. (Motion at ¶12.) Cook stated that the agents wanted working computers. (Motion at ¶12.) Petitioner then said this was all they had,

3

Cook repeated his request, and Petitioner repeated his denial regarding other computers. (Motion at ¶12.) One of the officers then stated that Petitioner's wife had "already consented to a search of the computers." (Affidavit at 7.) Petitioner then retrieved a mini-laptop from under a computer desk, stating, "This is what you want." (Motion at ¶13.) The agents then suggested that they go somewhere private to talk, and Petitioner pointed toward the bedroom. (Affidavit at 8.) Petitioner and the officers went back to the bedroom and "the door was closed." (Motion at ¶13; Affidavit at 8-9.) Petitioner states that agents stood between him and the closed doors and did not inform him of his rights. (Motion at ¶13.) Petitioner then confessed to using a file sharing program to look at pictures of minors. (Motion at ¶14.) Agent Cook informed him that he did not have to continue to speak with them. (Motion at ¶14.) However, Petitioner continued to answer questions and admitted to searching for and downloading child pornography using file sharing programs. (Motion at ¶14.) He described the process he used for finding and downloading files, and he told officers that he preferred "homemade teen stuff" in the "twelve to fifteen years old" age range. (Affidavit at 12-13.) He also admitted using another desktop computer to download child pornography. (Affidavit at 13.) When informed that any computers used to view the images would have to be destroyed, Petitioner first told officers to "just take them." (Motion at ¶17.) They told him that he would have to abandon the computers. (Motion at ¶17.) When he hesitated, they told him that he could abandon the computers or that they could take the computers and get a warrant to search them, thereby creating a public record, and that either way, the computers were coming with them. (Motion at ¶17.) Petitioner then agreed to abandon the computers.

4

(Motion at ¶17.) The agents took them, telling Petitioner that they would let him know if there would be any charges filed. (Motion at ¶17.)

In the end, agents recovered over 1300 images of child pornography from the computers, and a federal grand jury did bring charges against Petitioner. He was indicted for one count of distributing child pornography in violation of 18 U.S.C. § 2252A(a)(2)(A) and (b)(1), one count of receiving child pornography in violation of the same statutes, and one count of accessing images of child pornography via a computer with the intent to view in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2). The first two counts carried statutory penalties of five to twenty years of imprisonment, while the third carried a penalty of not more than ten years.

According to Petitioner, he met with his attorney, relayed the facts set out above in relation to the officers' visit to his home, and told his counsel, Robert Broadie, that he believed law enforcement violated his rights by coercing him into providing incriminating evidence and illegally monitoring his computer network. (Motion at ¶21.) Petitioner states that counsel dismissed the concerns about illegal monitoring, did not discuss a possible motion to suppress, and did not offer suggestions about how to defend against the charges. (Motion at ¶22.) Counsel did speak with Detective Sykes regarding some of Petitioner's allegations, but Sykes disagreed with Petitioner's version of events, and counsel told Petitioner that "it would be Sykes' word against [Petitioner's]." (Motion at ¶22, Affidavit at 20.) Petitioner contends that he pressed counsel to investigate the circumstances of the search further, but counsel "asserted any such motion would not be successful." (Motion at ¶60.) With respect to the substance of the charges, Petitioner contends that Broadie stated that trial was not a viable option due

5

to his inability to defend the charges, and advised Petitioner to accept a plea offer to the charge of accessing child pornography (Count 3). (Motion at ¶23.) Petitioner contends that Broadie told him that the advisory sentencing range under the United States Sentencing Guidelines would be 97 to 120 months, but that the judge hearing the case was lenient and that with no prior criminal record and the fact that the charge in Count 3 carried no mandatory minimum sentence, Petitioner would likely only receive a sentence of a few months in prison. (Motion at ¶23, 25.) In the end, Broadie filed no pretrial motions and Petitioner eventually pled guilty to only Count 3 of the Indictment. In order to allow Petitioner to remain free on bond pending sentencing in the case, the Court did not make an adjudication of the plea and the Government did not file or submit a factual basis.

According to Petitioner, when he next met with his attorney, he learned that the Government intended to seek a five-year sentence. (Motion at ¶27.) Petitioner allegedly responded by telling his attorney that he wanted to withdraw his guilty plea, but Broadie responded that he could not withdraw his plea just because the Government was asking for a certain sentence. (Motion at ¶27, Affidavit at 26.) Petitioner accepted this and, therefore, they did not discuss the idea of withdrawing the plea further. (Affidavit at 26.)

In addition to the facts set out in Petitioner's briefs and affidavits, he also supplied an Affidavit [Doc. #40] from his wife, Meghan DeBaere. It is much shorter than Petitioner's statements and mainly recounts the early part of the officers' visit to Petitioner's home prior to Petitioner's arrival. Ms. DeBaere states that the agents knocked on the door and identified themselves and asked if they could come in. Ms. DeBaere allowed them to come into the home and directed them to the kitchen. Agents explained that her IP address had been flagged

6

a few months earlier for possible inappropriate material, and Ms. DeBaere "immediately told them" about the situation with their seven-year-old son accessing pornography on a computer. She then agreed to allow them to "scan the two downstairs desktops." Regarding events after Petitioner's arrival, Ms. DeBaere states that officers initially questioned her husband regarding pornography, but that he denied any involvement. When Ms. DeBaere interjected that she had told the officers about their son's searches, officers directed Petitioner to a bedroom and told her to stay in the kitchen with another officer. She states that her husband and the officers emerged a few minutes later, at which time Petitioner retrieved two other computers. "Some comments were then exchanged," and Petitioner and the officers left the kitchen area. About a half an hour later, Ms. DeBaere saw Detective Sykes leaving the house with a desktop computer in his hand. He stopped to say that they would call if there were any charges.

Regarding Petitioner's guilty plea and his desire to withdraw it, Ms. DeBaere states that Petitioner explained the circumstances of the search to Broadie, and Petitioner argued that "he would have enough evidence to be acquitted." However, Broadie warned that a conviction on even one of the three charges would likely result in a significantly longer sentence than if Petitioner accepted the plea agreement. Petitioner signed the agreement. Later, after learning that the Government sought a five-year sentence, Petitioner asked to withdraw his guilty plea, but Broadie allegedly told him that he had already signed and submitted the plea agreement and that he could not withdraw it.

In response to the § 2255 Motion and supporting affidavits, Broadie filed an affidavit which the Government supplied as an exhibit to its Response [Doc. #41]. Broadie states that Petitioner never expressed to him that he felt investigators coerced him into turning over the

incriminating computers or giving statements or that he was in custody during his interview. Petitioner did indicate that he believed that authorities had improperly monitored his computers. Broadie investigated this, but concluded that he did not have reasonable grounds to raise that claim. He also investigated a defense against the distribution count, in case the matter went to trial, but this was mooted by the plea agreement which dropped that count. Broadie denies telling Petitioner that trial was not viable, but instead claims that he discussed the discovery with Petitioner and allowed him to make the decision concerning trial. He also estimated Petitioner's Guidelines range in advising him regarding the plea offer. He denies telling Petitioner that the sentencing judge was lenient, but states that he did feel comfortable making arguments in favor of a sentence below the advisory Guidelines range. He also states that he does not recall Petitioner asking to withdraw his guilty plea at any point.

Finally, in addition to the submissions of affidavits by the parties, the Government also filed a portion of the Department of Homeland Security's Report of Investigation [Doc. #42] describing the visit to Petitioner's home. According to that Report, during the course of the visit, officers asked Ms. DeBaere if she would call her husband and determine whether he was available to come to the house and speak with officers. Petitioner arrived at the home and spoke with investigators about the visit generally. When Agent Cook expressed interest in laptops, Petitioner retrieved the two inoperable laptops. Cook then asked to speak to Petitioner privately. The Report states that Petitioner, Sykes, and Cook went to a downstairs bedroom, where Petitioner closed the door. Then, after a few minutes of speaking with Agent Cook, Petitioner confessed to viewing child pornography via file sharing sites over a long period of time. When asked which computers he used to access child pornography, Petitioner

8

allegedly responded by retrieving the notebook computer from the hallway and indicating that he also used one of the family's desktop computers. Agents then explained that they would have to take the computers and that Petitioner could either agree to abandon them or they could provide a receipt, take the computers, and then seek a warrant to search them. Petitioner agreed to abandon the computers at that point.

Discussion

All of Petitioner's claims involve allegations of ineffective assistance of counsel. In order to prove ineffective assistance of counsel, a petitioner must establish, first, that his attorney's performance fell below a reasonable standard for defense attorneys and, second, that he was prejudiced by this performance. See Strickland v. Washington, 466 U.S. 668 (1984). With respect to the first prong of Strickland, the petitioner bears the burden of affirmatively showing deficient performance. See Spencer v. Murray, 18 F.3d 229, 233 (4th Cir. 1994). With respect to the second prong of Strickland, to establish prejudice, a petitioner must show the existence of a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have differed. Strickland, 466 U.S. at 694.

Petitioner's first and second claims are related. Plaintiff first contends that his attorney should have filed a motion to suppress the computers seized by authorities during their visit to Petitioner's home because the agents violated Petitioner's right to be free from an unreasonable search and seizure under the Fourth Amendment of the United States Constitution. Petitioner's argument is that his wife voluntarily allowed the agents into his home and gave consent for them to search two of their computers. However, when Petitioner returned home, officers questioned him regarding the existence of other computers, leading

9

him to supply the two non-functioning laptop computers. Asked about other computers, Petitioner made initial denials, prompting one of the officers to state that Petitioner's wife had already consented to the search of the computers. Petitioner claims that he understood this statement to mean that his wife's consent was binding on him as well and that the house and all computers in it would be searched. Faced with this inevitable search, he then turned over the mini laptop containing incriminating evidence. In his second claim for relief, he contends that, after turning over the mini laptop, the second round of questioning in the bedroom was a custodial interrogation which implicated his rights under the Fifth Amendment of the United States Constitution and that he was not informed of his rights to silence or counsel. He contends that his attorney rendered ineffective assistance of counsel in failing to suppress his statements based on the violation of his Fifth Amendment rights.

Petitioner's attorney denies that Petitioner shared these facts or informed him that he felt that authorities improperly coerced him into providing evidence or making incriminating statements. However, Petitioner contends that he did inform his attorney of these issues and that Broadie did not pursue them, but instead advised him to plead guilty. Assuming for the sake of this opinion that Petitioner's version is accurate, he still cannot prevail because he cannot show that his attorney provided ineffective assistance by advising him to plead guilty rather than pursuing a motion to suppress.

With respect to Petitioner's production of the mini laptop to investigators, Petitioner contends that this action was compelled by Sykes's false implied assertion that the officers could and would search the home for computers and search those computers based on the prior consent given by Petitioner's wife. It is possible that, had such an assertion been

explicitly made by Sykes, it might well support a motion to suppress. See Bumper v. North Carolina, 391 U.S. 543, 547–50 (1968) (finding that a false assertion of the existence of a search warrant for a home invalidated consent to search the home); United States v. Saafir, 754 F.3d 262, 266 (4th Cir. 2014) (finding that false assertion of the existence of probable cause to search a vehicle invalidated the driver's incriminating statements). However, those cases involved explicit misstatements of authority to search. Here, Petitioner's allegation is that Sykes simply stated that Petitioner's wife had given consent to search the computers. This was, in fact, a true and correct statement as to the previously-identified family computers. Standing alone, it also says nothing about consent to search any other computers, much less authority to search Petitioner's house to locate further computers and then search them. The intention and meaning of the statement are simply unclear, particularly as to the mini laptop, which was not known to the officers at the time of the statement. It would have been difficult to show based on this statement that a reasonable person would have understood the statement to be a false assertion of authority to search the entire house and any computers found therein.

Even assuming that the statement could be so construed, this would not have been the only hurdle faced by Petitioner and his attorney had they pursued a motion to suppress. Petitioner's version of events and the version set out in the Government's Investigative Report differ significantly in several ways. One key difference is that the Report states that Petitioner confessed to using the internet to view child pornography before turning over the mini laptop, which he turned over in response to Agent Cook asking which computer Petitioner used to access the pornography. This version of events completely contradicts Petitioner's contention

11

that he turned over the mini laptop before confessing and in response to the officers asking about other computers and Sykes's statement about consent. Petitioner does not contend that, under the version of the facts set out in the Report, his production of the mini laptop was compelled or coerced in violation of his rights. Therefore, had the presiding judge believed the officers' version of events, any motion to suppress would have been denied.

To be clear, the Court is not making a determination at this time about which set of facts is accurate. Instead, it is enough to simply note that Petitioner and the Government have provided very different versions of the facts. This means that in order to prevail on a motion to suppress, Petitioner would have had to present his version of the facts and have the presiding judge believe his version over the Government's version, which would have been no easy task in the present case for two reasons. First, Petitioner would have to take the stand to present his version of the facts. In doing so, he would have to admit that he repeatedly lied to the officers concerning his downloading of child pornography and the existence of other computers, thereby confirming his willingness to lie to avoid criminal liability. Second, although Cook and Sykes could have testified to the Government's version of events, Petitioner does not indicate that he had any other witness supporting his version of the key moments. His wife was present in the house, but in her statement she does not report seeing Petitioner turn over the mini laptop or report hearing Sykes make the statement about her consent to Petitioner. Therefore, she could not speak to either the timing or the circumstances of that event and it would be Petitioner's testimony against the officers' testimony. It is unlikely that he could have prevailed on any motion to suppress the images found on the seized computers.

12

Moreover, the facts alleged by Petitioner would not support Petitioner's contention that the encounter became nonconsensual. Petitioner agrees that officers were initially invited into the home by consent, that Petitioner's wife voluntarily gave consent to search two computers, and that he voluntarily agreed to answer the officer's questions. Petitioner contends that the interaction became nonconsensual when he "attempted to end the questioning and the encounter on multiple occasions by the following actions: 1) First, by denying any involvement in the accused activity in the presen[c]e of his wife; 2) He then further denied any involvement after being interrogated in his bedroom for the first time; 3) He further attempted to end the encounter again by providing broken laptops to the officers; and 4) He finally attempted to end the encounter by denying that he had any additional computers beyond the broken laptops." (Reply at 6; see also Exhibit [Doc. #32-1] at 10-12, 24.) However, even under Petitioner's version of events, Petitioner's denial that he had accessed child pornography and his offer of broken laptops did not constitute a request to end the encounter or an objection to continued searching or questioning. Petitioner does not contend that he asked officers to leave, that he told them he did not want to answer more questions, or that he objected to any further searches. His contention that his false statements denying involvement in child pornography and denying that he had additional computers somehow constituted a request to end the questioning and the encounter is simply misplaced.

As for Petitioner's incriminating statements, to prevail on a motion to suppress, he would have had to show that he was interrogated while in custody without being given the warnings required by Miranda v. Arizona, 384 U.S. 436, 444 (1966), prior to the interrogation. United States v. Hashime, 734 F.3d 278, 282 (4th Cir. 2013). Here, there appears to be no

13

dispute that Petitioner had not been formally arrested at the time he was questioned by authorities and there is no indication that the officers in his house informed him of his Miranda rights. As the Fourth Circuit explained in Hashime:

> When deciding whether a defendant not under formal arrest was in custody—and thus if the Miranda requirements apply—a court asks whether, "under the totality of the circumstances, 'a suspect's freedom of action [was] curtailed to a degree associated with formal arrest.'" Parker, 262 F.3d at 419 (quoting Berkemer v. McCarty, 468 U.S. 420, 440, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984)). This inquiry is an objective one, and asks whether "'a reasonable man in the suspect's position would have understood his situation' to be one of custody." United States v. Colonna, 511 F.3d 431, 435 (4th Cir.2007) (quoting Berkemer, 468 U.S. at 422, 104 S. Ct. 3138). In other words, the court considers whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." United States v. Jamison, 509 F.3d 623, 628 (4th Cir.2007) (alteration in original) (quoting Thompson v. Keohane, 516 U.S. 99, 112, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995)) (internal quotation marks omitted).
>
> Facts relevant to the custodial inquiry include, but are not limited to, "the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant." United States v. Day, 591 F.3d 679, 696 (4th Cir.2010) (quoting United States v. Weaver, 282 F.3d 302, 312 (4th Cir. 2002)) (internal quotation marks omitted). Also pertinent are the suspect's isolation and separation from family, see United States v. Griffin, 7 F.3d 1512, 1519 (10th Cir. 1993), and physical restrictions, United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990).

Id. at 282-83.

In the present case, the questioning of Petitioner by authorities occurred in his home during the day time after Petitioner's wife allowed the officers to enter. Petitioner does not report that the officers were harsh or impolite or that they raised their voices or otherwise issued direct commands in a way that could not be questioned. At most, he states that officers did not believe his false denials concerning his downloads and the existence of other

14

computers. Although there were three officers and they wore firearms, they did not unholster or display them beyond wearing them, as is common for law enforcement officers. Petitioner also does not claim that any physical contact occurred or that he was handcuffed or otherwise physically restrained. During the questioning, he contends that he was isolated, at the officers' request, from his family. However, his description of the encounter is again more consistent with a request than a command. Neither Petitioner nor his wife contends that they asked to stay together or protested when the officers asked Petitioner to speak with them privately. The questioning took place in Petitioner's home in a bedroom and appears to have been relatively brief, lasting about half an hour. The doors to the room were closed and officers stood near them, but Petitioner does not claim that they told him he could not leave or that he ever requested or attempted to leave, but was denied. He also does not report any threats or coercive questioning on the part of the officers. Indeed, in both Petitioner's account and the officers' account in the Investigative Report, he readily confessed to downloading and viewing child pornography. These facts stand in stark contrast to cases where custody is found to be present despite the lack of a formal arrest. See, e.g., Hashime, 734 F.3d at 285 (finding an interrogation to be custodial where agents entered a residence with guns drawn, removed the suspect and his family from bed and from the house, searched the house, interrogated him for three hours in a basement storage room, refused to allow him to be alone or move around alone, and refused family members requests to see him); United States v. Colonna, 511 F.3d. 431 (4th Cir. 2007) (finding an interrogation to be custodial where twenty-four officers entered the family home, kicked open the door to the suspect's room, entered it at gunpoint, awakened the suspect, slammed him into a door jam, restricted his and his family's access to his home,

15

took him to a police vehicle, and questioned him for three hours while guarding him during breaks). Petitioner's argument that, under the totality of the circumstances present here, his freedom of action was curtailed to nearly the degree associated with a formal arrest and that no reasonable person would have understood otherwise is extremely weak.

In the end, Petitioner had very little chance of succeeding on a motion to suppress either the mini laptop or his incriminating statements. He would have first needed to convince the presiding judge to believe his testimony over the testimony of the officers after admitting that he was willing to lie to the officers to avoid prosecution. Then, assuming that he could succeed at this task, he would have had to establish that officers made a false assertion of authority to search the entire house and any computers found therein, which is unsupported even under Petitioner's version of the facts. Likewise, even under Petitioner's version of the facts, he would not have been able to establish that he had somehow withdrawn consent or sought to end the encounter based solely on the fact that he denied any involvement in child pornography and proffered non-working computers. Finally, with respect to the incriminating statements, he would have had to demonstrate that any interrogation was "custodial in nature." For the reasons set out above, this was unlikely.

Given the significant obstacles just described, the chance of success on a motion to suppress would have been quite low. On the other hand, the potential for harm to Petitioner would have been quite high, as would the likely degree of that harm. Under the plea bargain that Petitioner reached instead of filing the motion to suppress, the Government agreed to drop the charges of distributing and receiving child pornography in violation of 18 U.S.C. § 2252A(a)(2)(A). This is significant because those charges not only carried a mandatory

minimum sentence of five years, but also allowed a maximum sentence of twenty years. The charge to which Petitioner pled guilty, accessing images of child pornography via computer with intent to view in violation of 18 U.S.C. § 2252A(a)(5)(B), carried no mandatory minimum sentence and capped Petitioner's sentencing exposure at ten years of imprisonment. The lack of a mandatory minimum sentence also allowed his attorney to argue for a sentence below 60 months. Petitioner did not ultimately receive such a sentence, but he was at least able to make the argument. Perhaps more importantly, Petitioner's advisory sentencing range under United States Sentencing Guidelines was 97 to 121 months of imprisonment following his guilty plea. The statutory maximum capped the range at 120 months. Had Petitioner been forced to plead to one or both of the dismissed charges, or had he been convicted of one of those charges at trial (a near certainty if the motion to suppress was denied by the judge and the images from the laptop and Petitioner's statements were presented to a jury), the range would not have been capped. In addition, that range included three levels of reduction for acceptance of responsibility under USSG § 3E1.1. Taking the stand while litigating a motion to suppress and testifying contrary to the investigating officers would have almost certainly removed this reduction. Further, Petitioner would have exposed himself to a potential further two-level increase in his sentencing range based on obstruction of justice under USSG § 3C1.1. The three-level increase would have raised Petitioner's advisory sentencing range to 135 to 168 months of imprisonment, while a further two-level increase would have raised it to 168 to 210 months. Without the ten-year statutory cap afforded by the plea agreement, Petitioner could have faced this entire amount of imprisonment. Finally, Petitioner's attorney was able to successfully argue for a downward variance from 97 months at the bottom of the applicable

17

range after his plea to a sentence of 70 months. Filing an unsuccessful motion to suppress and possibly also proceeding to trial might have negated this effort as well.

In light of the entire set of circumstances in Petitioner's case, advising Petitioner to plead guilty and forego a motion to suppress with little likelihood of success and a high risk of catastrophic failure does not constitute an unreasonable decision or deficient performance on the part of counsel. For similar reasons, Petitioner cannot show that he was prejudiced. In fact, the decision to plead guilty rather than pursue a motion to suppress very likely saved him from spending a number of additional years in prison. His first two claims of ineffective assistance of counsel fail and should be denied.

Petitioner's third claim for relief is that his attorney erroneously advised him that he could not withdraw his guilty plea after he learned that the Government intended to seek a 60-month sentence. To establish prejudice on an ineffective assistance claim following a guilty plea, a petitioner must establish that there is a reasonable probability that but for counsel's allegedly deficient conduct, he would not have pled guilty but would have gone to trial. Hill v. Lockhart, 474 U.S. 52 (1985). The Court must determine whether "a decision to reject the plea bargain would have been rational under the circumstances." Padilla v. Kentucky, 130 S. Ct. 1473, 1485 (2010) (citing Roe v. Flores-Ortega, 528 U.S. 470, 480, 486 (2000)). This determination is an objective one which is "dependent on the likely outcome of a trial had the defendant not pleaded guilty." Meyer v. Branker, 506 F.3d 358, 369 (4th Cir. 2007).

Here, a decision to withdraw the guilty plea and proceed to trial could only have been rational if Petitioner could pursue a viable motion to suppress. As already explained, Petitioner was unlikely to win any motion to suppress, which would mean that the evidence gathered

18

from the mini laptop and Petitioner's incriminating admissions would have been presented to the jury at trial. Petitioner contends that he never distributed the images he downloaded, but he does not contest the fact that he received the images or that he used a computer to access images of child pornography with the intent to view them.[2] This all but assures that he would have been convicted of two of the three counts in the Indictment and that he would have faced the harsher sentencing scenarios described previously. This would not have been rational under the circumstances. Therefore, Petitioner cannot demonstrate prejudice as to this claim and it should also be denied.

IT IS THEREFORE RECOMMENDED that Petitioner's Motion [Doc. #32] to vacate, set aside or correct judgment be denied, and that this action be dismissed.

This, the 20th day of October, 2017.

                 /s/ Joi Elizabeth Peake
                 United States Magistrate Judge

---

[2] Petitioner contends that the downloads did not have a time or date stamp (Exhibit at 27), but this would not have affected the strength of the evidence against him or the determination of the sentencing enhancements under the Sentencing Guidelines.

19